UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

CLERK'S OFFICE
U.S. DISTRICT COURT
AT ROANOKE, VA
FILED
March 06, 2026
LAURA A. AUSTIN, CLERK
BY: s/ S. Neily, Deputy Clerk

MICHAEL HALASSA, M.D., PhD,

Plaintiff,

v.

STEFAN OLINE

Defendant.

Case No. _____

7:26cv00200

**COMPLAINT**

**Introduction**

1.      Dr. Michael Halassa, MD, PhD ("Dr. Halassa"), Professor of Neuroscience and Psychiatry and incoming faculty leader within the Fralin Biomedical Research Institute at Virginia Tech, brings this action for compensatory and punitive damages against his former lab member, Defendant Stefan Oline ("Mr. Oline"), arising from Mr. Oline's ongoing and relentless campaign of harassment, interference and defamation.

2.      For many years, Mr. Oline has carried out an ever escalating, malicious effort to perpetuate bogus and fabricated complaints about Dr. Halassa within institutional HR departments at various academic institutions, through journalists and individuals who were then working or contemplating working at Dr. Halassa's research labs.

3.      Mr. Oline has supported his knowing, intentional and tortious efforts through social media campaigns, defamatory websites which included posting Dr. Halassa's private banking information, his home address and Dr. Halassa's wife's email address and even physical disruption of academic events, including appearing outside a public lecture at Princeton University to distribute false and defamatory written materials about Dr. Halassa. Most recently,

on February 20, 2026, Mr. Oline sent an unsolicited email riddled with knowingly false claims to students and faculty at Virginia Tech, in which he stated his intention to disrupt proceedings at the annual Society for Neuroscience meeting in Washington, D.C., causing multiple students and researchers to fear for their safety. Mr. Oline's efforts were expressly designed and intended to destroy Dr. Halassa's reputation within the Virginia Tech community and interfere with his new employment relationship.

4.      Stated in its simplest terms, Mr. Oline's actions have been relentless and have escalated over time. When confronted in the Fall of 2025 by his employer about his ongoing harassment and defamatory campaign against Dr. Halassa, Mr. Oline responded, "I don't care."

5.      Mr. Oline's false and malicious attacks against Dr. Halassa have been successful in causing severe professional harm and emotional damages, including the loss of multiple career opportunities, reputational damages, and the repeated burden of defending against baseless allegations that every single independent investigation which was initiated through Mr. Oline's lies has rejected as having no factual basis, resulting in Dr. Halassa's exoneration on each and every occasion.

6.      To be clear, every substantive allegation Mr. Oline has disseminated about Dr. Halassa has been formally investigated by independent fact-finders and found to be unsupported by any evidence. Nonetheless, Mr. Oline has been able to weaponize the mere existence of these investigations (which he himself initiated) as a basis to falsely legitimize his accusations and further his harassment campaign. Despite knowing that his allegations have been rejected and have no basis in reality, Mr. Oline persists in disseminating them in a malicious attempt to destroy Dr. Halassa's personal and professional reputation. His lies feed more lies and Mr. Oline seems intent upon continuing in his misconduct indefinitely. For these and the reasons set forth

below, Dr. Halassa is entitled to significant money damages and to the restoration of his

professional reputation.

## Parties, Jurisdiction, and Venue

7.      Dr. Michael Halassa is an individual who resides at 2221 Jefferson Street,

Apartment C, Roanoke, VA 24014.

8.      Stefan Oline is an individual who resides at 29133 Hickory Lane, Langhorne, PA

19047.

9.      The Court has federal diversity jurisdiction over this matter pursuant to 28 U.S.C.

§1332 because the amount in controversy exceeds $75,000 and the parties are citizens of

different states.

10.     Venue is proper in this district and division pursuant to 28 U.S.C. § 1391 because

a substantial part of the events giving rise to the claims occurred in Roanoke, Virginia.

## Facts

11.     Dr. Halassa is a distinguished neuroscientist and physician whose research

focuses on the circuit mechanisms underlying cognitive control and flexibility; how the brain

generates thoughts and action plans based on an internal model of the world. He received his

M.D. in Medicine and Surgery from the University of Jordan in 2004 and his Ph.D. in

Neuroscience from the University of Pennsylvania in 2009. He subsequently completed his

psychiatry residency and clinical fellowship in psychotic disorders at Massachusetts General

Hospital while simultaneously completing a postdoctoral fellowship in the Department of Brain

and Cognitive Sciences at the Massachusetts Institute of Technology ("MIT"). He established his

first laboratory at New York University ("NYU") in 2014 before being recruited to MIT in 2018.

12.    Among his major scientific contributions, Dr. Halassa and his team discovered foundational knowledge regarding the brain mechanisms underlying cognitive control, how they are disrupted in schizophrenia and how they can be targeted to enable more effective treatments. He has authored or co-authored over 60 scholarly publications in the world's foremost scientific journals, including multiple primary research papers in Nature. He has received 24 prizes, awards and fellowships, including the Vilcek Prize, awarded annually to immigrants who have made lasting contributions to American society. His research has been continuously and substantially funded by the National Institutes of Health and multiple foundations such as Sloan, Klingenstein, Feldstein, Simons and Pew.

13.    Trainees from Dr. Halassa's laboratory have secured faculty and research positions at leading institutions including the University of Pennsylvania, Stony Brook University, and the RIKEN Center for Brain Science, among others. Most recently, Dr. Halassa has joined Virginia Tech's Fralin Biomedical Research Institute as a faculty leader, where he is spearheading an integrated neuroscience and psychiatry program aimed at uncovering the brain basis of schizophrenia and translating those discoveries into more effective treatments for patients suffering from this devastating illness. Dr. Halassa has been a leading voice in adopting and educating mental health professionals on the use of cutting edge schizophrenia treatments.

14.    Mr. Oline joined Dr. Halassa's Lab at NYU in 2015 as a postdoctoral fellow. Unable to perform at the level expected of him, Dr. Halassa offered Mr. Oline the choice of seeking employment elsewhere or transitioning to a lab manager role. Mr. Oline elected to remain as lab manager in Dr. Halassa's lab.

15.    Dr. Halassa supported Mr. Oline in his position and even offered Mr. Oline the opportunity to follow him when Dr. Halassa's lab moved from NYU to MIT in 2018.

16.     Sometime thereafter, Mr. Oline claimed that the commute from his home in Pennsylvania to MIT was proving too burdensome. To aid Mr. Oline, Dr. Halassa personally contacted Dr. Annagret Falkner, a then junior faculty member at Princeton University, and secured a position for Mr. Oline at Princeton. At the time, both Dr. Falkner and Mr. Oline expressed gratitude and appreciation for Dr. Halassa's efforts undertaken on Mr. Oline's behalf.

17.     For reasons which are entirely unclear, at some time thereafter, it became clear that Mr. Oline blamed Dr. Halassa for Mr. Oline's lack of professional development. Mr. Oline became obsessed with seeking revenge against Dr. Halassa for some perceived (and non-existent) slight. It was at or around this time that Mr. Oline apparently dedicated his life to interfering in and destroying Dr. Halassa professional career by and through the perpetuation of knowing falsehoods.

18.     As part of his coordinated and concerted attack in this regard, Mr. Oline created a private channel on the app WhatsApp and invited past and current members of Dr. Halassa's lab to join him in his crusade. Through his echo chamber of lies, Mr. Oline was able to establish an organized platform for coordinating complaints against Dr. Halassa.

19.     Mr. Oline publicly launched his crusade against Dr. Halassa by coordinating the filing of complaints with the HR departments at NYU and MIT. He has acknowledged his actions in this regard in writing by stating, "*We (other former postdocs, graduate students, and research technicians) have gone to HR at NYU Langone and MIT.*"

20.     Simultaneously, Mr. Oline initiated and sustained contacts with a freelance journalist associated with the publication *Motherboard/Vice*, feeding her false allegations and directing her to other former lab members — individuals who were, by and large, members of the same WhatsApp network he had created. His effort to orchestrate a media story against Dr.

Halassa was sustained and deliberate.

21.     The accusations made by Mr. Oline to NYU, MIT and the freelance journalist centered around false claims of embezzlement by Dr. Halassa, academic and research fraud, animal cruelty, mistreatment of lab members and similar claims. Each and every one of Mr. Oline's claims was false and knowingly so. As discussed below, in each and every instance, Mr. Oline's claims have been thoroughly and comprehensive investigated by independent third parties (investigations initiated by Mr. Oline) and thoroughly rejected as baseless and not supported by any actual evidence.

22.     To defend against these baseless charges, Dr. Halassa was compelled to incur significant expense and retain legal counsel to assist him in these efforts. By way of example, legal counsel wrote to the freelance journalist in order to comprehensively expose each of Mr. Oline's false accusations, point by point. Ultimately, neither the freelance journalist nor any publisher was willing to publish Mr. Oline's falsehoods as they were exposed for what they were: fabrications and mistruths.

23.     From the outset of his campaign and continuing through today, Mr. Oline engaged in a coordinated and systematic effort to directly contact incoming and prospective Halassa Lab members, actively attempting to dissuade them from joining Dr. Halassa's lab through the perpetuation of falsehoods.

24.     In one documented example, Mr. Oline contacted, on an unsolicited basis, an incoming postdoctoral fellow who was coming to work at Dr. Halassa's lab and claimed in writing that:

> *I'm reaching out as a courtesy to give you a heads up on the culture of the lab you'll be joining soon... You may wonder why the turnover is so high... This is delicate, please keep it to yourself that I'm contacting you as I'm risking some retaliation.*

25.     Mr. Oline requested the conversation continue over WhatsApp or Signal (where written messages are deleted) so he could continue his defamatory crusade without a written record being available to expose his activities.

26.     Mr. Oline's identification and unsolicited approaching of Dr. Halassa's then-current and potential lab members has been ongoing and pervasive for literally years. This sustained pattern of recruitment interference has served to tortiously interfere in Dr. Halassa's employment and professional relationships and has interfered in his ability to continue with his research efforts.

27.     While Mr. Oline's formal complaints have been dismissed or determined to be unfounded, they did succeed in creating the very toxicity around Dr. Halassa that Dr. Oline had fabricated in the first place. In other words, Mr. Oline's repeated claims and false accusations were assumed by many to be true; after all they were provoking formal investigations. And while all of the investigations resulted in Dr. Halassa's vindication, his reputation suffered significantly among the research community. Thus, although Mr. Oline's formal efforts to have an independent body validate his bogus claims failed, his efforts succeeded in harming Dr. Halassa in an equally meaningful way.

28.     Due in part to Mr. Oline's harassment campaign, and the willingness of MIT's administrative apparatus to take seriously his fabricated allegations, Dr. Halassa's professional life at MIT became untenable. Dr. Halassa began seeking employment opportunities at institutions better suited to his research mission and professional goals. Dr. Halassa believed, wrongly so, that moving on from that poisoned environment would also be associated with relief from Mr Oline.

29.     Across multiple recruitment efforts — both positions he was invited to pursue and

positions he applied for — the pattern was consistent: initial enthusiasm, advancement to late

stages including requests for external tenure letters, and then abrupt termination of those

discussions. At one institution, a department chair later informed Dr. Halassa directly that the

recruiting institution had contacted him with concerns about problems that recruiting institution

had heard were ongoing in Dr. Halassa's lab. These claims mirrored Mr. Oline's false claims

despite having been rejected by and through multiple independent investigations. The cumulative

professional and financial damage from these failed recruitments was substantial.

30.     While Dr. Halassa looking for other professional opportunities outside of MIT, an

MIT independent investigation proceeded. Among other things, the investigation undertook a

detailed review of three formal research misconduct allegations originating from Mr. Oline's

campaign. All three allegations were found to be completely unsupported by any evidence or

witness testimony. The investigation concluded that the Halassa Lab maintained the highest

standards of scientific integrity, that Dr. Halassa's conduct throughout the relevant period

demonstrated a commitment to research integrity, and that the allegations may not have been

introduced in good faith (by Mr. Oline).

31.     Thereafter, and presumably angry that his formal complaints had not yielded the

result he wanted, Mr. Oline resorted to a public campaign on Twitter/X, posting multiple tweets

making accusations against Dr. Halassa including allegations of research misconduct, financial

impropriety, and workplace harassment.

32.     Mr. Oline's tweets surfaced in connection with Dr. Halassa's appointment as

Director of the Neuroscience Center at the Helsinki Institute of Life Science at the University of

Helsinki.

33.     Naturally, the University of Helsinki took the allegations seriously and conducted

its own independent inquiry, contacting both Dr. Halassa and his previous employers.  After a comprehensive investigation, the University of Helsinki issued a formal statement to University leadership and senior faculty concluding:

> *Based on the inquiries made by the University of Helsinki, nothing has come to light that would affect Halassa's ability to successfully carry out his duties as Director of NC. No evidence has emerged to support the allegations. Michael Halassa has shown good cooperation and proactivity in relation to the investigation. He has the full confidence and support to perform his duties as Director.*

34.    Ultimately, for several reasons involving Finland being so far from his primary employment which Dr. Halassa had then arranged at Tufts University ("Tufts") and the inability to make a European part-time employment opportunity viable, Dr. Halassa resigned his position as Director of the Neuroscience Center at the Helsinki Institute of Life Science at the University of Helsinki and returned full time to his laboratory at Tufts.

35.    Having failed to suppress Dr. Halassa's career through direct institutional complaints, journalism, and public social media attacks, Mr. Oline escalated his lies to a federal agency, specifically the National Institute of Health ("NIH"). Mr. Oline apparently knew that if he approached Tufts with the same bogus allegations which had previously been rejected by NYU, MIT and then the University of Helsinki, a direct complaint to Tufts would likely fail.

36.    Thus, Mr. Oline elected to perpetuate his false claims with NIH, knowing that NIH would mandate that Tufts, as a recipient of NIH grants, investigate the matter. Mr. Oline's gambit proved successful in causing Tufts to investigate Dr. Halassa.

37.    Specifically, Mr. Oline requested and participated in a Zoom meeting with NIH representatives conveying his fabricated allegations of hostile work environment, verbal abuse, bullying, and harassment which Mr. Oline claimed was then occurring in Dr. Halassa's lab. Mr. Oline's statements to the NIH, which he made to trigger an investigation by Tufts, were

knowingly false when made. Mr. Oline had not been in Dr. Halassa's lab in years and knew no one who worked in his lab. Mr. Oline was simply fabricating claims from whole cloth.

38.    The NIH took the matter seriously and, just as Mr. Oline knew would be the case, referred the matter to Tufts to investigate. Tufts then commissioned a fully independent external investigation undertaken by a law firm, applying the preponderance of evidence standard.

39.    Before the investigation concluded, Mr. Oline attempted to recruit at least one additional former colleague to join his cause. That person refused and described Mr. Oline's allegations to investigators as not credible, and characterized Mr. Oline as "a sexual harasser, a creep and a stalker" — a characterization that appeared in the formal investigative record.

40.    Independent investigator Kevin M. Kinne, Esquire of the law firm of Cohen Kinne Valicenti & Cook LLP completed a comprehensive external investigation on behalf of Tufts.  The investigative conclusions included the following:

> *There is insufficient evidence that Dr. Halassa has violated the WWOA Policy. Dr. Halassa does not unreasonably interfere with the performance of academic or employment responsibilities of those with whom he works. Mutual respect guides his day-to-day interactions with those in the Halassa Lab.*

41.    The independent investigation further found that:

- Every current Halassa Lab member testified that Dr. Halassa has never subjected them to a hostile work environment, verbal abuse, harassment, bullying, or made them feel unsafe.

- Dr. Halassa's lab was described uniformly as "drama-free," "supportive," "the best educational experience of my life."

- The investigator found that "the primary source of the Allegations was a person who has no connection or affiliation with Tufts and last worked with Dr. Halassa in 2018" — expressly identifying Mr. Oline.

- Four current lab members who previously worked with Mr. Oline at other institutions specifically and directly contradict his allegations, describing them as "completely unfounded" and coming from "someone who had a score to settle."

- The investigation found no evidence that any complaints originated from anyone currently working with Dr. Halassa.

42.     Apparently upset that his pervasive and persistent campaign of harassment had not succeeded in driving Dr. Halassa from academia and scientific research, Mr. Oline further escalated his attacks by personally appearing at events where Dr. Halassa was scheduled to speak, handing out flyers with a QR code directing the public to a defamatory website promoting a series of recycled lies about Dr. Halassa which had been, again and again, rejected by each and every independent body called upon by Mr. Oline to investigate his baseless claims.

43.     More specifically, in June, 2025, Dr. Halassa was asked to participate as a host of a round table at an academic conference at Princeton University. Dr. Halassa was unable to attend the meeting and members of his lab presented on his behalf.

44.     Mr. Oline, who was not registered for the conference and appeared unannounced at the premises. His goal and intention in appearing unannounced at the event was to interfere in the event and humiliate Dr. Halassa.

45.     On Saturday June 8, 2025, during the final event of the conference, Mr. Oline entered the venue and distributed printed flyers containing a QR code linking to a defamatory website which itself set forth false content about Dr. Halassa to audience members.

46.     Specifically, the defamatory website included a photograph of Dr. Halassa directly next to the following false statement of fact: "**Michael Halassa is a criminal and a fraud**." The defamatory website likewise included at least the following malicious and false claims about Dr. Halassa, each of which constitutes defamation per se as they falsely accuse Dr. Halassa of criminal conduct and/or professional misconduct: that Dr. Halassa systematically

embezzled research funds through a deliberate scheme; that Dr. Halassa fabricated and falsified

research data; that Dr. Halassa intentionally harmed and neglected research animals; and that

anyone who collaborates with, publishes with, or supports Dr. Halassa is 'complicit' in his

alleged crimes.

47.    Mr. Oline's defamatory website also posted Dr. Halassa's private, personal

information in an effort to intentionally inflict emotional distress upon him and presumably to

encourage visitors to the website to target Dr. Halassa and his family. Specifically, Mr. Oline

posted one of Dr. Halassa's bank checks including his home address and his private banking

information. The defamatory website also disclosed Dr. Halassa's wife's email address.

48.    The website further targeted Dr. Halassa's "collaborators" by name, including Dr.

Sabine Kastner of Princeton University, in a transparent attempt to isolate Dr. Halassa

professionally and destroy his remaining academic relationships. Every one of Mr. Oline's

assertions set forth on his website had been formally investigated and rejected by independent

fact-finders.

49.    Due to Mr. Oline's interference, event planners called campus police intervene.

Officer Tyler Vandegrift documented the incident and provided Mr. Oline with a case number

for his wrongful conduct. Rather than treating police involvement as a serious warning, Mr.

Oline solicited the officer's advice as to how to escalate his harassment campaign further,

including inquiring as to how Mr. Oline could file complaints with local police departments in

multiple cities regarding Mr. Oline's completely fabricated allegation that Dr. Halassa had

embezzled money years earlier while at NYU.

50.    On June 9, 2025, Mr. Oline sent a written follow-up email to those involved in the

event, including the event planners and Dr. Halassa's colleagues. Mr. Oline's email reflects a

comprehensive admission of the campaign he had been undertaking and his tortious methods. In it, Mr. Oline stated:

> "My goal is to distribute this information as widely as possible."

> "We (other former postdocs, graduate students, and research technicians) have gone to HR at NYU Langone and MIT, we've spoken to a journalist, I've even blasted this information on Twitter."

> "I am determined to do what is within my power to prevent him from taking advantage of a single additional trainee if I can help it."

> "I feel like I've tried everything."

51.     Mr. Oline went on to claim credit for Dr. Halassa's departure from the Helsinki Institute of Life Science at the University of Helsinki stating that the institution "decided to terminate him on December 12, 2023 effective immediately" and speculating that his Twitter campaign was the cause.

52.     Mr. Oline's claim in this regard was false as Dr. Halassa had resigned voluntarily from his part-time external appointment and the University of Helsinki had previously issued a formal statement of confidence in Dr. Halassa following its own investigation into Mr. Oline's allegations.

53.     In the same email, Mr. Oline attempted to recruit others to support his campaign, specifically inviting the event promoter, Dr. Kastner, to "join me in speaking up against research misconduct and harassment of trainees." Mr. Oline went on to falsely claim, without any basis whatsoever, that Dr. Halassa was "potentially performing the double dip at this conference." Mr. Oline's reference to "double dip" was a debunked and baseless claim he had previously made about Dr. Halassa seeking reimbursement for the same items multiple times. Dr. Halassa was not even physically present at that event.

54.     Mr. Oline also referenced a Princeton graduate student, David Zlotowski, as

someone he claims was affected by Dr. Halassa, and he invited Dr. Kastner to ask her colleague

Dr. Jonathan Pillow about an unspecified incident — neither claim accompanied by any

documentation or specifics.  It was another one of Mr. Oline's fabrications.

55.     Unwilling to cease in his illegal interference and harassment, in the fall of 2025,

Mr. Oline appeared outside of Dr. Kastner's public lecture at Princeton. There, Mr. Oline again

distributed printed flyers to program attendees containing QR codes linking to defamatory

content about Dr. Halassa. The flyers (and the subsequent website posts) were updated to include

not only the same defamatory content about Dr. Halassa which Mr. Oline had distributed and

published in June, 2025 but additional defamatory content concerning Dr. Kastner. Dr. Kastner

was so disturbed by Mr. Oline's presence and actions that she initially refused to proceed with

her lecture.

56.     Dr. Annagret Falkner, Mr. Oline's own supervisor and Assistant Professor at

Princeton, confronted Mr. Oline outside the lecture hall. Through the exchange, Dr. Falkner told

Mr. Oline he should stop because his behavior it was harming the community. Mr. Oline

responded: *"I don't care."*  Dr. Falkner then told Mr. Oline his behavior was hurting her lab. Mr.

Oline responded: *"I don't care."* Dr. Falkner then told Mr. Oline that her tenure review is

upcoming and his conduct was putting that review at risk. Mr. Oline responded: *"I don't care

about that either."*

57.     In or about March of 2025, Dr. Halassa applied for and was selected, following a

rigorous nine-month search process involving multiple rounds of interviews, to serve as the

Inaugural Faculty and the Neuroscience Leader of the Patient Research Center at Virginia Tech's

Fralin Biomedical Research Institute. This position represented a singular career opportunity for

Dr. Halassa — uniquely structured to allow him to fully merge his dual identity as a clinician and

a scientist, and to realize his vision for a new model of psychiatry grounded in neural circuit

mechanisms and computational principles. No comparable opportunity had previously existed

for Dr. Halassa to integrate these two dimensions of his work at this scale and with this level of

institutional support.

58.    Dr. Halassa's appointment at the Fralin Biomedical Research Institute at Virginia

Tech is set to be publicly announced following his official start date of April 1, 2026.

59.    Mr. Oline took no time and seized upon informal chatter in the field regarding Dr.

Halassa's new employment opportunity hoping to destroy his relationship with Virginia Tech

before it even began.

60.    Toward that end, on or about February 20, 2026, Mr. Oline continued his

relentless campaign of harassment, interference and defamation by forwarding an unsolicited

email to multiple parties at Virginia Tech, including the Office of the Vice President for

Research, multiple faculty members, graduate students and postdoctoral fellows, as well as Dr.

Michael Friedlander, the Executive Director of the Fralin Biomedical Research Institute at

Virginia Tech.  A true and accurate copy of Mr. Oline's email is attached hereto as Exhibit A.

61.    The email attached as Exhibit A contains the false and defamatory statements that

Dr. Halassa "got run out of town at NYU, then MIT, then Helsinki, then Tufts" and that he

engages in:

> a.    "Embezzlement of research funds (make sure you've got someone dedicated
>
>        to this task, as he continues to do so even after he's been repeatedly caught in
>
>        the act)";
>
> b.    "Embezzlement of startup funds (same as applies from above, I managed his
>
>        travel in 2017 and he would double dip with exorbitant travel and food

expenses, purchasing them with the lab card, paying for them with his startup

fund, and then fraudulently depositing the reimbursements into his personal

bank account";

c.  "Wage theft of lab technicians (he had to settle with NYU, which forced him

to provide backpay to one of two technicians that he had promised in advance

to pay 'after a tryout period' which extended to 9 weeks, and he then refused

to pay out";

d.  "Fabrication of research data";

e.  "Animal mistreatment (At NYU, we frequently housed animals in the lab

space, under the couch in his office, etc to hide them from the IACUC. At

MIT, when CAC would tell us to euthanize an animal that was not recovering

from surgery, we (Ralf) would hide the animal in the lab for a week, and then

reintroduce it to the vivarium under a new animal ID, pretending it's a new

animal)";

f.  "Overall general harassment of any and all employees that he has power

over."

62.    To attempt to exacerbate the damage to Dr. Halassa and his reputation, Mr. Oline

forwarded his email to Dr. Friedlander to Virginia Tech's Office of Research and Innovation and

to various individual research officers who worked at Virginia Tech. A true and accurate copy of

Mr. Oline's subsequent email is attached hereto as Exhibit B.

63.    Mr. Oline's subsequent email began by saying he "[f]igured I'd give the grad

students, postdocs, and med students a heads up, this dude is Bad News. Friends don't let friends

work for Harassa." In addition to containing the same defamatory statements as Exhibit A, the

email chain went on to falsely claim that "Mike Halassa embezzles grant money, fabricates data, and submits others' work as his own for publication. He had us running animals in secret at MIT before EHS and LAR had even inspected the lab for animal use …" See Exhibit B.

64.     Additionally, it claimed that "[t]his information is specifically relevant to research integrity and animal welfare," implying that Dr. Halassa lacks research integrity and does not care about animal welfare. And Mr. Oline further tried to bolster his credibility by falsely stating about his defamatory allegations that "[i]f you'd like to go to the source, just contact any of the others that have performed investigations into his research misconduct" and then listing five individuals who purportedly would confirm Mr. Oline's outrageous and defamatory accusations. Id.

65.     Mr. Oline's emails were broadly disseminated to representatives at Dr. Halassa's incoming institution at the precise moment his appointment was being finalized for the sole purpose of attempting to destroy Dr. Halassa's opportunity for success at Virginia Tech.

66.     Mr. Oline's email forwarded to Virginia Tech personnel includes false, defamatory and malicious statements of and concerning Dr. Halassa. Mr. Oline's statements set forth in his February 20, 2026 emails were negligent and maliciously published to humiliate Dr. Halassa, to destroy his reputation and undermine and destroy his relationship with Virginia Tech, its students and those associated with Virginia Tech.

67.     Mr. Oline's February 20, 2026 emails republished all of his prior false allegations — claims that Dr. Halassa had engaged in financial misconduct, data fabrication, animal mistreatment, and workplace harassment — and falsely characterized Dr. Halassa as having been "run out of town" at NYU, MIT, Helsinki, and Tufts.  Each of Mr. Oline's statements were false and defamatory.

68.     Indeed, every allegation published in Mr. Oline's email has been investigated and found unsupported. Notably, Mr. Oline's email to Dr. Friedlander and other important constituents in the Virginia Tech community was sent with full knowledge that each and every allegation set forth in his email had been fully adjudicated, independently investigated and determined to be fully and completely without merit.

69.     Below is a factual summary supporting the falsity of each and every category of defamation made by Mr. Oline in his false and defamatory February 20, 2026 email.

### Oline's False Claims To Virginia Tech Of Dr. Halassa Being "Run Out of Academic Institutions

70.     Mr. Oline's claim that Dr. Halassa had been "run out of town at NYU, then MIT, then Helsinki, then Tufts" was false, defamatory and knowingly so.

71.     Dr. Halassa was not "run out" of NYU. NYU offered to nominate Dr. Halassa for tenure and asked him to stay. Indeed, Dr. Richard Tsien, Executive Director of the NYU Neuroscience Institute at the time, met with Dr. Halassa repeatedly to try to convince him to stay. Multiple senior faculty including Dr. Gyorgy Buzsaki, and other prominent leaders within the NYU neuroscience community visited Dr. Halassa's office to try to convince him to stay. Dr. Halassa left to accept a recruitment offer from MIT, a decision he later regretted. The majority of his NYU lab members voluntarily relocated with him to MIT — conduct wholly inconsistent with a hostile or problematic departure, and directly contradicting Mr. Oline's false narrative that Dr. Halassa's exit from NYU was the result of misconduct or institutional pressure.

72.     Dr. Halassa's departure from MIT followed its refusal to honor explicit commitments made to him at the time of his recruitment. Specifically, department leadership had promised Dr. Halassa on multiple occasions that he would be put up for early tenure based on his publication record and standing in the field. Those promises were never honored, despite his

promotion to Associate Professor being described by multiple faculty sources as "the strongest case in years." Mr. Oline's fabricated complaints caused devastating and lasting damage to Dr. Halassa's career and reputation at MIT and beyond. Having secured an appointment as Associate Professor with tenure at Tufts University, Dr. Halassa resigned from MIT. Dr. Halassa was later promoted to Full Professor at Tufts, the highest rank in academia.

73.     Dr. Halassa resigned voluntarily from his part-time external directorship at the University of Helsinki Neuroscience Center in December 2023. His departure had nothing to do with Mr. Oline's false claims made on Twitter as, noted above, the University of Helsinki investigated the matter and exonerated Dr. Halassa. Dr. Halassa instead resigned for personal reasons involving his desire to focus on his laboratory at Tufts University. Dr. Halassa maintains collaborative relationships with scientists at the University of Helsinki, including new Neuroscience Center Director Dr. Satu Palva, with whom he has co-authored a scientific manuscript under review.

74.     Lastly, it is a lie to suggest that Dr. Halassa was "run out of Tufts."  Dr. Halassa was promoted to Full Professor at Tufts — the highest rank in academia, achieved by a few faculty and representing the institution's most definitive expression of confidence in a scholar's scientific contributions, leadership, and integrity. Dr. Halassa retains, to this day, his appointment. His transition to Virginia Tech was a voluntary career advancement. As noted above, in February 2025, an independent external investigation commissioned by Tufts found no evidence of any misconduct.

### Mr. Oline's False Claims To Virginia Tech Of Embezzlement And Financial Impropriety At NYU

75.     Mr. Oline's bogus claims made to Virginia Tech (and repeated to others for years) that Dr. Halassa has engaged in any financial misconduct in any manner whatsoever is patently

and demonstrably false.

76.    Despite Mr. Oline repeating this claim for years, over and over, no institution has

ever determined or found any evidence of financial misconduct by Dr. Halassa.

77.    Ironically, Mr. Oline himself served as lab manager during the period he now

describes as fraudulent. He performed poorly in that role, as documented by contemporaneous

emails showing his sustained confusion about reimbursement procedures. After Mr. Oline's

departure, reimbursement issues in the lab were "virtually non-existent," per lab manager Valerie

Hoke, who has confirmed that financial processing and reimbursement was her responsibility,

not Dr. Halassa's, and that MIT's own audit processes never flagged any irregularity.

78.    Mr. Oline's claim to Virginia Tech that he "managed his travel in 2017" and

personally witnessed double-dipping is false and has been debunked (and deemed not credible)

by multiple independent investigators.

### Mr. Oline's False Claims To Virginia Tech Of Wage Theft

79.    Mr. Oline's accusation in this regard has no basis in reality. He has never

produced any evidence to support it and no investigation has ever substantiated it in any manner

whatsoever. Mr. Oline's fabrication in this regard has been spun from whole cloth.

### Mr. Oline's False Claims To Virginia Tech of Fabrication of Research Data

80.    Mr. Oline's claim to Virginia Tech that Mr. Oline fabricated research data is

itself, utterly fabricated.

81.    MIT's independent investigator completed a detailed review of three formal

research misconduct allegations originating from Mr. Oline. All three allegations were found to

be unsupported by any evidence or witness testimony. The investigation concluded that the

Halassa Lab maintained the highest standards of scientific integrity, that Dr. Halassa's conduct

throughout the relevant period demonstrated a commitment to research integrity, and that Mr.

Oline's allegations may not have been introduced in good faith.

### Mr. Oline's False Claims To Virginia Tech Of Dr. Halassa Mistreating Animals

82.    Mr. Oline's claim to Virginia Tech that Dr. Halassa had mistreated animals is

baseless.

83.    No institutional animal care body at NYU, MIT, or Tufts has ever cited Dr.

Halassa's lab for violations. The Tufts investigation specifically examined animal care

compliance. The Laboratory Animal Medicine Service representatives confirmed that Dr.

Halassa "responds properly with respect to all compliance issues, is responsive and has never

had an issue with respect to his lab's treatment of animals."

84.    At MIT, the animal transport from NYU was conducted under written, approved

protocols with approved couriers and subsequent quarantine, in space approved by MIT's

Department of Comparative Medicine ("DCM"). Dr. Ralf Wimmer, the lab's principal research

scientist — the individual Mr. Oline specifically named in connection with the MIT animal

allegations — confirmed that the move was approved in advance by DCM.

85.    Mr. Oline's specific claim that animals were hidden "under the couch in his

office" to evade regulatory oversight is false, fabricated and has never been substantiated in any

investigation across three institutions and many years.

### Mr. Oline's False Claims To Virginia Tech of General Harassment of Employees

86.    Mr. Oline's allegation in this regard has been refuted, again and again, and Mr.

Oline knows his claim is false.

87.    The Tufts investigation interviewed every then-current Halassa Lab member. One

hundred percent of them stated that Dr. Halassa has never subjected them to a hostile work

environment, verbal abuse, harassment, bullying, or made them feel unsafe. The work

environment was described as "drama-free," "supportive," "the best educational experience of

my life," and providing "the best learning opportunity I have had."

88.    Lab members who previously worked alongside Mr. Oline at NYU and MIT

specifically and directly contradicted Mr. Oline's allegations, describing them as "completely

unfounded," "not true," and coming from "someone who had a score to settle."

89.    Mr. Oline's persistent, pervasive and relentless campaign of harassment,

interference and defamation has caused, and continues to this day to cause Dr. Halassa

significant and profound economic, reputational and emotional harm.

### COUNT I
### DEFAMATION

90.     Dr. Halassa repeats and realleges the allegations in each of the foregoing

paragraphs as if explicitly stated herein.

91.    Dr. Halassa is a private individual entitled to the protections against defamation

afforded private individuals.

92.    As set forth above, Mr. Oline has published a series of false statements of fact to

third parties within the past year, including but not limited to representatives of Virginia Tech

and through a distributed QR code which leads to a defamatory website. These statements are set

forth above, including in Paragraphs 46, 61, 63, and 64 herein.

93.    Mr. Oline's published statements of fact were false, defamatory and in many

cases defamatory per se because they prejudiced Dr. Halassa in his profession and impute a lack

of integrity to Dr. Halassa.

94.    Mr. Oline's published false statements of fact were published negligently and/or

with malice. Specifically, Mr. Oline possessed actual malice when he made these statements

because he made them with the knowledge that they were false and/or with a reckless disregard for their falsity. Even with such intent, he has persisted in trying to ruin Dr. Halassa's career through a ceaseless campaign of defamation and harassment, even telling others that he does not care about the consequences of his actions.

95.    Mr. Oline's published false statements of fact have caused, and continue to cause, Dr. Halassa significant damages, including economic, reputational and emotional harm.

96.    Mr. Oline's malicious conduct entitles Dr. Halassa to punitive damages arising from this relentless and persistent defamatory misconduct.

## COUNT II
## TORTIOUS INTERFERENCE WITH CONTRACT AND BUSINESS EXPECTANCY

97.    Dr. Halassa repeats and realleges the allegations in each of the foregoing paragraphs as if explicitly stated herein.

98.    Dr. Halassa possesses significant contractual relationships and business expectancy relationships, including through academic institutions and the scientific and research community.

99.    Mr. Oline is aware of Dr. Halassa's business relationships and business expectancy relationships.

100.    As described above, Mr. Oline has intentionally interfered with Dr. Halassa's business relationships and business expectancy relationships.

101.    Mr. Oline has intentionally interfered in Dr. Halassa's business relationships and business expectancy relationships with improper motives and through improper means, namely, his persistent defamation as alleged herein.

102.    Mr. Oline's intentional inference in Dr. Halassa's business relationships and

business expectancy relationships has caused and continues to cause Dr. Halassa significant

damages including the disruption of these relationships.

103.    Mr. Oline's conduct was willful, wanton, and/or showed a conscious disregard for

Dr. Halassa's rights entitling Dr. Halassa to punitive damages.

**COUNT III**
**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

104.    Dr. Halassa repeats and realleges the allegations in each of the foregoing

paragraphs as if explicitly stated herein.

105.    Mr. Oline's conduct as described above – in repeatedly disseminating false

information about Dr. Halassa designed to ruin his career – was intentional and/or reckless.

106.    Mr. Oline's conduct as described above was so extreme, outrageous, and

intolerable that it offends all generally accepted standards of decency and morality.

107.    As a result of Mr. Oline's conduct, Dr. Halassa has suffered severe emotional

distress.

108.    Mr. Oline's conduct was willful, wanton, and/or showed a conscious disregard for

Dr. Halassa's rights entitling Dr. Halassa to punitive damages.

WHEREFORE, Michael Halassa, MD, PhD demands that judgment be entered in his

favor on all counts of his Complaint, including all such accompanying relief as the Court deems

appropriate, including but not limited to:

    i.  after trial, enter judgment on Counts I through III in favor the Plaintiff and against

       the Defendant and award damages in the amount(s) so assessed by the jury;

    ii.  award Dr. Halassa punitive damages;

    iii. award Dr. Halassa his attorneys' fees and costs; and

    iv.  grant such other and further relief as the Court deems just and proper.

**JURY DEMAND**

**DR. HALASSA DEMANDS A TRIAL BY JURY**

Dated: March 6, 2026                    Respectfully submitted,

                                             **MICHAEL HALASSA,**

                                             */s/ J. Benjamin Rottenborn*
                                             J. Benjamin Rottenborn (VSB # 84796)
                                             ben.rottenborn@woodsrogers.com
                                             WOODS ROGERS VANDEVENTER BLACK PLC
                                             10 South Jefferson Street, Suite 1800
                                             Roanoke, VA 24011
                                             Phone: (540) 983-7600
                                             Fax: (540) 983-7711

                                             David H. Rich (BBO No. 634275)
                                             drich@toddweld.com
                                             TODD & WELD LLP
                                             One Federal Street, 27th Floor
                                             Boston, MA 02110
                                             (617) 720-2626
                                             (Pro Hac Vice Motion Forthcoming)

                                             *Counsel for Plaintiff*